# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 24, 2009        Decided July 7, 2009

No. 08-1078

SOUNDEXCHANGE, INC.,
APPELLANT

v.

LIBRARIAN OF CONGRESS,
APPELLEE

SIRIUS XM RADIO INC.,
INTERVENOR

———

On Appeal of an Order
of the Copyright Royalty Judges

———

*David A. Handzo* argued the cause for appellant. With him on briefs were *Mark D. Schneider* and *Michael B. DeSanctis*.

*Sarang Vijay Damle*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Michael F. Hertz*, Acting Assistant Attorney General, and *Scott R. McIntosh* and *Mark R. Freeman*, Attorneys.

*R. Bruce Rich* argued the cause and filed the brief for intervenor. *Karyn K. Ablin*, *Bruce G. Joseph*, and *Michael L. Sturm* entered appearances.

Before: GINSBURG, HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

GINSBURG, *Circuit Judge*: In 2008 the Copyright Royalty Judges (CRJ) set the royalty rate that satellite radio services must pay to copyright owners for the use of sound recordings during the years 2007-2012. SoundExchange, an organization established to collect and distribute royalties to the copyright owners, appeals the CRJ's determination, arguing it is arbitrary, capricious, and not supported by substantial evidence. We affirm the CRJ's determination with respect to the royalty rate for the use of sound recordings but reverse with respect to the CRJ's failure to set a royalty rate for "ephemeral copies" of sound recordings.

## I.   Background

The Congress has created two types of copyrights in a musical recording. One is for the underlying "musical work," that is, the written music; a copyright in the musical work affords the owner the exclusive right to perform the work in public. 17 U.S.C. § 106(4). The broadcast of a song (whether recorded or performed live) over terrestrial or satellite radio is a performance of the musical work and therefore requires a license from the copyright owner. A "sound recording" is a performance of a musical work that is affixed to a recording medium; until 1995 the owner of the

copyright to a sound recording did not enjoy an exclusive performance right. In that year the Congress afforded the owner of the copyright to a sound recording the narrow but exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission," *id*. §§ 106(6), 114(d); in effect, this assured the copyright owner the ability to charge a royalty for a license to play its work on a satellite radio service (SRS). If a mutually agreeable royalty cannot be negotiated between an SRS company and a copyright owner, then the Copyright Royalty Judges — an agency comprising three members appointed by the Librarian of Congress — is to set "reasonable rates and terms of royalty payments," *id*. § 114(f)(1)(A), "calculated to achieve the following [four] objectives":

> (A) To maximize the availability of creative works to the public.

> (B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.

> (C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.

> (D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

*Id.* § 801(b)(1).

The SRS Companies — Sirius Radio and XM Radio — and a predecessor to SoundExchange agreed upon a rate in 2003 that would remain in effect until the end of 2006. In 2004 the Congress provided that, if SoundExchange and the Companies had not already agreed upon the royalty to be paid thereafter, then in January 2006 the CRJ would begin ratemaking proceedings for the six-year period 2007-2012. *Id*. § 804(b)(3)(B). The three principals did not agree upon a rate and the proceeding here under review duly followed.

For a starting point from which to consider the four objectives, the CRJ looked to "comparable marketplace royalty rates as 'benchmarks,' indicative of the prices that prevail for [other, *e.g.*, online] services purchasing similar music inputs for use in digital programming." *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 73 Fed. Reg. 4080, 4088/2 (Jan. 24, 2008) (*Determination of Rates*). The agency considered the record evidence reflecting various experts' opinions and concluded that a rate equal to 13% of SRS gross revenue, as proposed by SoundExchange, "marks the upper boundary for a zone of reasonableness for potential marketplace benchmarks from which to identify a rate that satisfies" the objectives in § 801. *Id.* at 4094/1. The agency set the lower bound at the 2.35% of gross revenue the Companies were then paying for the right to use musical works, but found "a rate close to the upper boundary is more strongly supported than one close to the lower boundary." *Id.* at 4094/1-2.

The CRJ then turned to the four statutory objectives in order to locate a specific rate within the zone of reasonableness. With respect to the first two objectives —

maximizing the availability of creative works to the public and ensuring copyright owners and users a fair rate of return — the agency found the record did not support a thumb on the scale in favor of either SoundExchange or the SRS Companies. The CRJ then determined the third and fourth objectives — reflecting the relative roles of the owner and the user in making the product available and minimizing the disruptive impact upon the industries involved — each warranted a royalty rate somewhat lower than 13%:

> [G]iven that the current rates paid by the [SRS Companies] for these [licenses] are in the range of 2.0 to 2.5% of revenues, an immediate increase to the upper boundary of the zone of reasonableness (i.e., 13%) would be disruptive inasmuch as the [Companies] have not yet attained a sufficient subscriber base nor generated sufficient revenues to reach consistent Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") profitability or positive free cash flow.

*Id.* at 4097/2. The agency also found the 13% rate would endanger the SRS Companies' planned investment in new satellites. Weighing the conflicting evidence in the record, the CRJ chose an initial rate equal to 6.0% of revenue, increasing to 8.0% over the six-year term of the license.

After setting a royalty rate for the Companies' transmission of musical works, the CRJ considered what portion of that rate should be attributed to their right to make "ephemeral copies" of musical works. An ephemeral copy is a digital copy of a sound recording stored on a computer; an SRS creates an ephemeral copy as an intermediate step toward satellite transmission of the sound recording.

Under 17 U.S.C. § 112, the CRJ is to set the royalty rate for an ephemeral copy at the level "most clearly represent[ing] the fees that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 112(e)(4). Finding them to be of little value, however, the CRJ decided not to set a separate royalty rate for ephemeral copies, but rather deemed the § 112 rate for an ephemeral copy "embodied" in the rate set for the § 114 license.

## II. Analysis

We may set aside the CRJ's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see* 17 U.S.C. § 803(d)(3) ("Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection"), or if the facts relied upon by the agency have no basis in the record, *Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*, 662 F.2d 1, 8 (D.C. Cir. 1981). Although we have not yet issued a decision in a case involving the CRJ, we have reviewed a decision of its predecessor applying the four objectives in § 801(b)(1). In *RIAA v. Copyright Royalty Tribunal* we held "three distinct aspects of [§ 801] increase the deference" we owe the agency. *Id.* First, the agency is required "to estimate the effect of the royalty rate on the future of the music industry," which requires a "forecast of the direction in which the future public interest lies ... based on the expert knowledge of the agency." *Id.* Second, the agency has "legislative discretion in determining copyright policy in order to achieve an equitable division of music industry profits between the copyright owners and users." *Id.* Finally, "the statutory factors pull in opposing directions, and reconciliation of these objectives is committed to the [agency] as part of its mandate to determine 'reasonable' royalty rates."

*Id.* at 9; *see Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999) ("When an agency must balance a number of potentially conflicting objectives ... judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular").

SoundExchange argues the CRJ's decision was arbitrary and capricious because the agency misapplied the four objectives in § 801 and because the decision was internally inconsistent. The Librarian of Congress, in turn, argues the CRJ's decision is supported by substantial evidence and that SoundExchange has failed to point to any convincing evidence showing the decision was inconsistent. SoundExchange, the Librarian, and Intervenor Sirius-XM agree the CRJ erred by failing to set a rate for the § 112 license, although each advocates a different remedy.

A. The § 114 Rate

SoundExchange first argues the CRJ erred by using the third and fourth objectives as "trump cards" to reduce the market-based rate of 13%, which it had proposed and which, it asserts, the agency had found was a reasonable rate supported by the first two objectives. This argument need not occupy us long as it both mischaracterizes the agency's decision and ignores relevant precedent. The CRJ never held a 13% rate best satisfied the first two statutory objectives; rather it identified 13% as "the upper boundary for a zone of reasonableness ... [within] which to identify a rate that satisfies" the objectives set out in § 801. *Determination of Rates*, 73 Fed. Reg. at 4094/1. Even if the CRJ had held 13% a reasonable rate, the agency was under no obligation to choose a rate derived from a market-based approach. In *Recording Industry Association of America v. Librarian of*

*Congress*, 176 F.3d 528, 533 (1999), we held in no uncertain terms the "claim that [§ 801] clearly *requires* the use of 'market rates' is simply wrong."

SoundExchange next argues the CRJ's decision is internally inconsistent because the agency relied upon testimony that a rate in excess of 6-8% of total revenue would threaten the viability of the SRS Companies but then made those rates applicable to less than total revenue. The CRJ did indeed exclude from the calculation of royalties revenues from (1) subscriptions to and the sale of advertising on channels that make only incidental use of sound recordings; (2) the sale or license of equipment; and (3) miscellaneous other sources. *Determination of Rates*, 73 Fed. Reg. at 4102/2-3. SoundExchange focuses upon the exclusion of advertising revenue and asserts that, if such revenue were included in the measure of "gross revenue," then the royalties payable in 2007 and 2012 would be greater by $4.4 million and $38 million respectively.

SoundExchange again mischaracterizes the CRJ's decision; the evidence regarding the future earnings prospects and viability of the SRS Companies was not based upon their "total revenue." Each of the sundry experts who testified concerning future revenues included and excluded divers sources of revenue, presumably because some revenues are not predicated upon the use of copyrighted music. Indeed, SoundExchange's own expert proposed a royalty rate to be applied to less than all revenues. *See id*. at 4087/2 n.21 (quoting SoundExchange's expert as having testified "rates should reflect purchasers' willingness to pay for *music content*").

Moreover, in rejecting the argument SoundExchange made in its petition for rehearing that the decision was

inconsistent, the CRJ noted "[t]here was no credible evidence ... that any of the types of revenue excluded from gross revenues in the Initial Determination currently constitute or are projected to account for an amount of gross revenues that would significantly impact the calculation." On appeal, SoundExchange still points to "no credible evidence" in the record.

The $4.4 and $38 million figures cited by SoundExchange are unreliable for two reasons. First, they were calculated by applying the royalty rates to all projected advertising revenues from 2007-2012, including advertising revenues from sources that use music incidentally if at all, *e.g.*, talk radio channels. SoundExchange never contended and the CRJ never opined that revenue from such non-music sources should be included in calculating the royalty payments. Second, the measure of gross revenues adopted by the CRJ includes advertising revenue earned by channels that do use musical recordings. Yet SoundExchange included those revenues in calculating the alleged $4.4 and $38 million "underpayments."

SoundExchange makes two further arguments. First, it argues the CRJ's decision to set the royalty rate below 13% out of concern for the SRS Companies' future earnings and need to make planned investments in new satellites was not supported by substantial evidence. Second, SoundExchange argues it was arbitrary and capricious for the CRJ not to have considered cost-savings from the then-pending merger between Sirius and XM. We think the CRJ's consideration of both issues was reasonable and supported by the record.

As we observed in *RIAA v. Copyright Royalty Tribunal*, we owe substantial deference to the agency's decisions under § 801 because the four objectives it must pursue point in

different directions, requiring the agency first to predict the future course of the music industry and then to work an equitable division of projected music industry profits. 662 F.2d at 8-9. Our review of the record and of the CRJ's well-reasoned decision demonstrate both that the former provides substantial evidence in support of the latter and that the agency has not exercised its broad discretion in an arbitrary or capricious manner.

B.   The § 112 Rate

After the CRJ released its decision, the Register of Copyrights rendered her opinion that the CRJ erred in failing to set a separate rate for the § 112 license to make ephemeral copies:

> The section 112 statutory license applies to reproductions, while the section 114 statutory license applies to public performances. Moreover, the beneficiaries of the section 114 license are not identical to the beneficiaries of the section 112 license. Royalties collected under section 114 are paid to the performers and the copyright owners of the sound recordings ... whereas, the royalties collected pursuant to the section 112 license are not paid to performers. Without separate rates for both the section 114 and 112 licenses, SoundExchange is unable to allocate properly the funds it collects as the Designated Agent and fulfill ... its responsibility to distribute receipts to stakeholders.

*Review of Copyright Royalty Judges Determination*, 73 Fed. Reg. 9143, 9146 (Feb. 19, 2008). As a result, the Librarian

concedes the CRJ erred and asks us to remand the matter to the agency to set an appropriate rate.

Pointing out that "the court may enter its own determination with respect to the amount or distribution of royalty fees," 17 U.S.C. § 803(d)(3), both SoundExchange and Sirius-XM suggest the court set the § 112 rate. SoundExchange argues, as it did before the agency, the rate should be set at "8.8% of the total royalty," *i.e.*, 8.8% of the royalty paid for the § 114 license would be attributed to the § 112 license and paid to the beneficiaries thereof. The CRJ held that, because SoundExchange failed to present any evidence on behalf of copyright owners about the value of the § 112 license, "the paucity of the record" prevented it from adopting that proposal. *Determination of Rates*, 73 Fed. Reg. at 4098/3. For its part, Sirius-XM asks us to set the § 112 rate at zero because SoundExchange has failed to demonstrate the license has any value at all.

The paucity of evidence identified by the CRJ counsels against our setting any rate. The only sensible choice, therefore, is to remand the matter to the agency to set an appropriate rate.

## III.  Conclusion

For the reasons set out above, the determination of the CRJ is affirmed with respect to the § 114 royalty rate for the use of sound recordings. The CRJ has substantial discretion to balance the four objectives in 17 U.S.C. § 801(b)(1) and SoundExchange gives us no reason to think the agency's decision was arbitrary, capricious, or not supported by substantial evidence; the CRJ was under no obligation to

choose a market-based rate and there is no convincing evidence the CRJ was inconsistent in its use of revenue measures. The determination of the CRJ is reversed with respect to the § 112 royalty rate for ephemeral copies and the matter is remanded the CRJ to set the royalty rate in the first instance.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring:  As this case demonstrates, billions of dollars and the fates of entire industries can ride on the Copyright Royalty Board's decisions.  The Board thus exercises expansive executive authority analogous to that of, for example, FERC, the FCC, the NLRB, and the SEC.  But unlike the members of those similarly powerful agencies, since 2004 Copyright Royalty Board members have not been nominated by the President and confirmed by the Senate.  Instead, as a result of a 2004 statute, Board members are appointed by the Librarian of Congress alone.  Board members are removable by the Librarian, but only for cause.  Moreover, in exercising important duties, Board members are apparently unsupervised by the Librarian of Congress or by any other Executive Branch official.

The new statutory structure raises a serious constitutional issue.  Under the Appointments Clause, principal officers of the United States must be nominated by the President and confirmed by the Senate.  U.S. CONST. art. II, § 2, cl. 2.  Copyright Royalty Board members plainly are officers of the United States.  And they appear to be principal officers – not inferior officers – because they are not removable at will and their decisions regarding royalty rates apparently are not reversible by the Librarian of Congress or any other Executive Branch official. *See Edmond v. United States*, 520 U.S. 651, 662-66 (1997); *see also* 17 U.S.C. §§ 701, 801-03; Tr. of Oral Arg. at 24 (Government counsel agreeing that Librarian of Congress and Register of Copyrights cannot change copyright royalty rates set by the Board).

If the members of the Board are in fact principal officers, then the present means of appointing Board members is unconstitutional.  But no party here has timely raised a constitutional objection.  We therefore may resolve the case without deciding whether the Board is constitutionally structured, and so I join the opinion of the Court.