# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 7, 2012         Decided July 6, 2012

No. 11-1083

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,
A RHODE ISLAND NON-PROFIT CORPORATION,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD AND LIBRARY OF CONGRESS,
APPELLEES

COLLEGE BROADCASTERS, INC. AND SOUNDEXCHANGE, INC.,
INTERVENORS

———

On Appeal from a Final Order of the Copyright Royalty
Board

———

*Christopher J. Wright* argued the cause for appellant. With him on the briefs were *Timothy J. Simeone* and *William Malone*.

*Kelsi Brown Corkran*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Tony West*, Assistant U.S. Attorney General, and *Scott R. McIntosh*, Attorney.

*Michael B. DeSanctis* argued the cause for intervenor SoundExchange, Inc. in support of appellees. With him on

the brief were *David A. Handzo*, *William M. Hohengarten*, and *Garrett A. Levin*.

*Catherine R. Gellis* was on the brief for intervenor College Broadcasters, Inc. in support of appellee.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Intercollegiate Broadcasting, Inc. appeals a final determination of the Copyright Royalty Judges ("CRJs" or "Judges") setting the default royalty rates and terms applicable to internet-based "webcasting" of digitally recorded music. We find we need not address Intercollegiate's argument that Congress's grant of power to the CRJs is void because the provision for judicial review gives us legislative or administrative powers that may not be vested in an Article III court. But we agree with Intercollegiate that the position of the CRJs, as currently constituted, violates the Appointments Clause, U.S. Const., art. II, § 2, cl. 2. To remedy the violation, we follow the Supreme Court's approach in *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010), by invalidating and severing the restrictions on the Librarian of Congress's ability to remove the CRJs. With such removal power in the Librarian's hands, we are confident that the Judges are "inferior" rather than "principal" officers, and that no constitutional problem remains. Because of the Appointments Clause violation at the time of decision, we vacate and remand the determination challenged here; accordingly we need not reach Intercollegiate's arguments regarding the merits of the rates and terms set in that determination.

3

\* \* \*

Intercollegiate is an association of "noncommercial" webcasters who transmit digitally recorded music over the internet in educational environments such as high school and college campuses—a technologically updated version of "closed circuit" campus radio stations. As with traditional radio, such digital transmissions are "performances" under the Copyright Act and thus entitle the owner of a song's copyright to royalty payments. See 17 U.S.C. § 106(6). And since 1998, the act has provided a "statutory license" for webcasting—a set of provisions that encourage voluntary negotiations over licensing terms but provide, if the parties cannot agree, for proceedings before the CRJs to establish reasonable terms. See *id.* § 114(d)(2), (f)(2)-(3); see also *id.* § 112(e)(4) (similar licenses for "ephemeral recordings").

The administrative body responsible for setting these terms has changed in name and structure over time, but the Copyright Royalty Board (the regulatory name for the collective entity composed of the CRJs and their staff, see 37 C.F.R. § 301.1) was established in its current form in 2004 and is composed of three Copyright Royalty Judges who are appointed to staggered six-year terms by the Librarian of Congress. See Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. § 801 *et seq.*). When a ratemaking proceeding is initiated, the Judges are tasked with "mak[ing] determinations and adjustments of reasonable terms and rates of royalty payments," 17 U.S.C. § 801(b)(1), where "reasonable" means payments that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller," *id.* § 114(f)(2)(B); see also *id.* § 112(e)(4).

SoundExchange, Inc. (an intervenor here) is a non-profit clearinghouse for musicians' webcast royalty payments. In 2008 it initiated ratemaking proceedings before the CRJs to set the default webcasting licensing rates for the years 2011-2015. The Judges initiated proceedings and received 40 petitions to participate, mainly from webcasters. Over the next two years, SoundExchange entered voluntary settlements with almost all of the participants, leaving only two webcasting participants, Intercollegiate and one other licensee, Live365 (a commercial webcaster). (Live365 originally appealed the CRJs' determination as to commercial webcaster rates but reached a settlement with SoundExchange before the filing of opening briefs.) Intervenor College Broadcasting, Inc., an association of educational webcasters similar to Intercollegiate, participated in cooperation with SoundExchange, providing the CRJs their settlement agreement as a reference for market rates.

After reviewing the evidence and testimony from the remaining participants, the CRJs issued a final determination in which they adopted as statutory rates the royalty structure agreed to in the settlement between SoundExchange and College Broadcasting. See 76 Fed. Reg. 13,026, 13,042/1 (Mar. 9, 2011). Those terms include a $500 flat annual fee per station for both "educational" and other noncommercial webcasters whose "Aggregate Tuning Hours" stay below a monthly threshold separating them from commercial webcasters. See *id*. at 13,039/1, 13,040/1. The CRJs rejected Intercollegiate's proposal to establish different fee structures for "small" and "very small" noncommercial webcasters. See *id*. at 13,040/2-13,042/1. Intercollegiate appealed the CRJs' determination pursuant to 17 U.S.C. § 803(d)(1).

5

* * *

Intercollegiate first argues that all determinations made by the CRJs are void because the relevant appeal provision purports to ask Article III courts to take actions of a kind beyond their constitutional jurisdiction. Specifically, 17 U.S.C. § 803(d)(1) provides for appeals of the CRJs' determinations to the D.C. Circuit, and § 803(d)(3) states:

> Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection. If the court modifies or vacates a determination of the Copyright Royalty Judges, *the court may enter its own determination* with respect to the amount or distribution of royalty fees and costs, and order the repayment of any excess fees, the payment of any underpaid fees, and the payment of interest pertaining respectively thereto, in accordance with its final judgment. The court may also vacate the determination of the Copyright Royalty Judges and remand the case to the Copyright Royalty Judges for further proceedings in accordance with subsection (a).

17 U.S.C. § 803(d)(3) (emphasis added). Intercollegiate claims that this provision vests us with powers unsuitable for an Article III court, citing *Federal Radio Commission v. General Electric Co.*, 281 U.S. 464 (1930). There the Court addressed a provision vesting in the courts of the District of Columbia a power to substitute their own "determination" for that of an agency; it found the power to be legislative or administrative rather than judicial. Because the courts of the District were then legislative in character, their exercise of such a power presented no problem, but the Court regarded its review of such a legislative or administrative decision as beyond *its* authority under Article III. *Id*. at 469. As Congress clearly meant to provide an avenue for appeal, yet

specified an invalid one, Intercollegiate argues, we must throw out the whole regime.

We conclude that we need not address this objection because it has no bearing on Intercollegiate's case. So far as the substance of the CRJs' decision is concerned, no party has asked us to enter our own determination, but rather to review the decision for compliance with 17 U.S.C. § 114(f)(2)(A). See Appellant's Br. 17-18 (seeking vacation and remand for lack of compliance with that provision); Appellees' Br. 43 (seeking affirmance). That challenge is evaluated under the familiar APA arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), which is incorporated by direct reference in § 803(d)(3). Intercollegiate insists that § 803(d)(3) is "facially unconstitutional" and therefore brings down the whole CRJ determination process even if the defective provision is not applicable in this case. Appellant's Reply Br. 29. But as the government points out, Intercollegiate has made no attempt to satisfy the common standard for a facial constitutional challenge, Appellees' Br. 16 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or justify the non-application of that standard, or explain why the allegedly offensive language wouldn't be severable, see *id*. at 19-20. Intercollegiate offers nothing in reply. See Appellant's Reply Br. 29-30. We note, incidentally, that power to make our "own determination" would appear to present no problem on an issue as to which the law permitted only one option.

* * *

Intercollegiate argues that the Copyright Royalty Board as currently structured violates the Constitution's Appointments Clause, art. II, § 2, cl. 2, on two grounds: (1) the Judges' exercise of significant ratemaking authority, without any effective means of control by a superior (such as unrestricted removability), qualifies them as "principal"

officers who must be appointed by the President with Senate confirmation; and (2) even if the Judges are "inferior" officers, the Librarian of Congress is not a "Head of Department" in whom Congress may vest appointment power. We have discussed these issues in prior cases, but we never resolved them because they were not timely raised by the parties. See *SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220, 1226-27 (D.C. Cir. 2009) (Kavanaugh, J., concurring); *Intercollegiate Broadcast Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755-56 (D.C. Cir. 2009) (per curiam). Now that they are properly presented, we agree with Intercollegiate on the first claim but not the second, and accordingly provide a remedy that cures the constitutional defect with as little disruption as possible.

The Appointments Clause provides that

[The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2. To qualify as an "Officer of the United States" within the meaning of the clause, i.e., not simply an "employee," a person must "exercis[e] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125-26 (1976); see *Freytag v. Commissioner*, 501 U.S. 868, 880-82 (1991). Intercollegiate contends that the CRJs not only exercise significant authority, but are "principal" rather than "inferior" officers, so that Congress's decision to vest their appointment in the Librarian

rather than the President (with Senate approval) violates the text of Article II.

The government concedes that the CRJs meet this initial threshold of significant authority. If significance plays no role *beyond* that threshold, i.e., has no bearing on whether an officer is principal or inferior, then we may pass on to the major differentiating feature, the extent to which the officers are "directed and supervised" by persons "appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). But there is in fact some conflict over whether there are relevant degrees of significance in the authority of officers, so we first briefly examine the conflict and then consider the significance of the CRJs' authority.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court held that an independent counsel appointed by the Attorney General was an inferior rather than principal officer. *Id*. at 671-72. The counsel was removable "only for good cause," see *id*. at 663, but the Court also stressed that she was "empowered by the Act to perform only certain, limited duties," with no "authority to formulate policy for the Government or the Executive Branch," and that her office was not only "limited in jurisdiction," but also "'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated," see *id*. at 671-72. The deprecatory language about the independent counsel's duties seems to rest on a premise that levels of significance may play some role in the divide between principal and inferior.

But in *Edmond* the Court, once satisfied that the persons in question exercised significant authority and were thus officers, 520 U.S. at 662, went on to discuss only direction and supervision. And it observed that the exercise of

significant authority "marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and nonofficer." *Id.*

In any event, assuming that significance of authority has any import beyond setting the threshold for officers, it is a metric on which the CRJs score high. Their ratemaking decisions have considerable consequences—as our colleague put it, "billions of dollars and the fates of entire industries can ride on the Copyright Royalty Board's decisions." *SoundExchange*, 571 F.3d at 1226 (Kavanaugh, J., concurring). The CRJs set the terms of exchange for musical works not only on traditional media such as CDs, cassettes and vinyl, but also on digital music downloaded through iTunes and Amazon.com, digital streaming via the web, rates paid by satellite carriers, non-commercial broadcasting, and certain cable transmissions. See 17 U.S.C. §§ 115(c)(3)(C)-(D) (phonorecords), 114(f)(1) & (f)(2)(A)-(B), (subscription and non-subscription digital transmissions and satellite radio services), 112(e)(3)-(4) (ephemeral recordings), 118(b)(4) (non-commercial broadcasting), 111(d)(4) (secondary transmissions by cable systems). Even though the CRJs affect Intercollegiate only in regard to webcasting, *Freytag* calls on us to consider all the powers of the officials in question in evaluating whether their authority is "significant," not just those applied to the litigant bringing the challenge. 501 U.S. at 882; *Tucker v. Commissioner*, 676 F.3d 1129, 1132 (D.C. Cir. 2012).

Of course one might see these authorities of the CRJs as primarily addressing "merely rates." But rates can obviously mean life or death for firms and even industries. Intercollegiate calls our attention, for example, to a firm for which royalty expenses constitute half its costs. See Appellant's Reply Br. 6-7; see generally *id*. 4-11.

As we noted, *Edmond* accepts officers' classification as "inferior" if their "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U.S. at 663. In concluding that the judges of the Coast Guard Court of Criminal Appeals were inferior officers, the Court emphasized three factors: (1) the judges were subject to the substantial supervision and oversight of the Judge Advocate General (who in turn was subordinate to the Secretary of Transportation), see *id.* at 664; (2) the judges were removable by the Judge Advocate General without cause, see *id.* ("The power to remove officers, we have recognized, is a powerful tool for control." (citing *Bowsher v. Synar*, 478 U.S. 714, 727 (1986); *Myers v. United States*, 272 U.S. 52 (1926))); and (3) another executive branch entity, the Court of Appeals for the Armed Forces, had the power to reverse the judges' decisions so that they had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive Officers." *Id.* at 664-65.

As to *Edmond*'s first concern, the CRJs are supervised in some respects by the Librarian and by the Register of Copyrights, but in ways that leave broad discretion. The Librarian (who is appointed by the President with advice and consent of the Senate, see 2 U.S.C. § 136) is entrusted with approving the CRJs' procedural regulations, 17 U.S.C. § 803(b)(6); with issuing ethical rules for the CRJs, *id.* § 802(h); and with overseeing various logistical aspects of their duties, e.g., *id.* §§ 801(d)-(e) (providing administrative resources), 803(c)(6) (publishing CRJs' decisions), 801(b)(8) (assigning CRJs additional duties). None of these seems to afford the Librarian room to play an influential role in the CRJs' substantive decisions.

The Register (who is appointed by the Librarian and acts at his direction, see *id.* § 701(a)) has the authority to interpret

the copyright laws and provide written opinions to the CRJs on "novel material question[s]" of law; the CRJs must abide by these opinions in their determinations. See *id.* § 802(f)(1)(B). The Register also reviews and corrects any legal errors in the CRJs' determinations. *Id.* § 802(f)(1)(D). Oversight by the Register at the direction of the Librarian on issues of law of course is not exactly direction by a principal officer, *Edmond*, 520 U.S. at 663, but it is a non-trivial limit on the CRJs' discretion, and the Librarian may well be able to influence the nature of the Register's interventions.

But the Register's power to control the CRJs' resolution of pure issues of law plainly leaves vast discretion over the rates and terms. If one looks to market conditions, as one statutory provision governing webcasting directs, see 17 U.S.C. § 114(f)(2), each copyright owner and would-be user are in something akin to a bilateral monopoly—a situation where the seller has no substitute purchaser (here, because each purchaser represents a distinct channel to end-users) and the buyer no exact substitute supplier (assuming each creative work is in some sense unique). (It is not a strict bilateral monopoly, as many songs, etc., may have fairly close substitutes.) In such a case, the range of possible market prices is likely to be very wide: the floor is likely to be very low (adding a user will commonly cost the copyright holder nothing) and the ceiling relatively high, especially for creative material that has few close substitutes.

Moreover, the CRJs also apply ratemaking formulas that are even more open-ended. For example, § 801(b)(1) directs the CRJs to set "reasonable terms and rates of royalty payments" with reference to four factors: (1) to "maximize the availability of creative works"; (2) to provide a "fair" return to both the copyright owner and the copyright user; (3) to "reflect the relative roles" of the owner and user as to "creative contribution, technological contribution, capital

investment," and the like; and (4) to "minimize any disruptive impact" on industry structure. 17 U.S.C. § 801(b)(1)(A)-(D). As we have previously stated, because these "factors pull in opposite directions," there is a "range of reasonable royalty rates that would serve all these objectives adequately but to differing degrees." *RIAA v. Copyright Royalty Tribunal*, 622 F.3d 1, 9 (D.C. Cir. 1981). Thus the Register's control over the most significant aspect of the CRJs' determinations—the rates themselves—is likely to be quite faint. Even in the realm of rates required to be based on "cost," the ratemaker typically has broad discretion. See *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 278 (1976) ("[T]here is no single cost-recovering rate, but a zone of reasonableness: 'Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high.'" (quoting *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251 (1951))). And while we have recognized that an obligation to follow another's legal opinions creates a genuine supervisory limit, see *Tucker*, 676 F.3d at 1134, here the law does not provide much constraint on the rate, and it is the rate itself—not the answer to the pure questions of law that the Register can address—that is of the greatest importance.

We find that, given the CRJs' nonremovability and the finality of their decisions (discussed below), the Librarian's and Register's supervision functions still fall short of the kind that would render the CRJs inferior officers.

The second *Edmond* factor, removability, also supports a finding that the CRJs are principal officers. Unlike the judges in *Edmond*, the CRJs can be removed by the Librarian only for misconduct or neglect of duty. See 17 U.S.C. § 802(i). And while the presence of a "good cause" restriction in

*Morrison* did not prevent a finding of inferior officer status, it clearly did not hold that such a restriction on removal was generally consistent with the status of inferior officer. Instead, as *Edmond* explains, *Morrison* relied heavily on the Court's view that the independent counsel also "performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited [to performance of a 'single task']." *Edmond*, 520 U.S. at 661.

Finally, the CRJs' rate determinations are not reversible or correctable by any other officer or entity within the executive branch. As we have mentioned, their procedural rules are reviewed by the Librarian, and their legal determinations by the Register. But the Judges are afforded

> full independence in making determinations concerning adjustments and determinations of copyright royalty rates and terms, the distribution of copyright royalties, the acceptance or rejection of royalty claims, rate adjustment petitions, and petitions to participate, and in issuing other rulings under this title, except that the Copyright Royalty Judges may consult with the Register of Copyrights on any matter other than a question of fact.

17 U.S.C. § 802(f)(1)(A)(i); see also *id*. § 802(f)(1)(A)(ii) (Register's authority "under this clause shall not be construed to authorize the Register . . . to provide an interpretation of questions of procedure . . . [or] the ultimate adjustments and determinations of copyright royalty rates and terms"). Thus, unlike the judges in *Edmond*, 520 U.S. at 664-65, the CRJs issue decisions that are final for the executive branch, subject to reversal or change only when challenged in an Article III court.

Having considered all of these factors, we are in agreement with the view suggested by Judge Kavanaugh in

*SoundExchange* that the CRJs as currently constituted are principal officers who must be appointed by the President and confirmed by the Senate, and that the structure of the Board therefore violates the Appointments Clause. 571 F.3d at 1226-27 (concurring opinion). We therefore must decide the appropriate remedy to correct the violation.

In *Free Enterprise Fund*, the Supreme Court reviewed the structure of the Public Company Accounting Oversight Board, whose members were appointed and removable by the Commissioners of the Securities and Exchange Commission. The Court held that in the circumstances of that case the "for-cause" restriction on the Commissioners' removal power violated the Constitution's separation of powers by impeding the President's ability to execute the laws. See 130 S. Ct. at 3151-54. Rather than finding all authority exercised by the PCAOB to be unconstitutional, however, the Court held that invalidating and severing the problematic for-cause restriction was the solution best matching the problem and preserving the remainder intact. *Id.* at 3161 (citing *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328 (2006)).

We likewise conclude here that invalidating and severing the restrictions on the Librarian's ability to remove the CRJs eliminates the Appointments Clause violation and minimizes any collateral damage. Specifically, we find unconstitutional all of the language in 17 U.S.C. § 802(i) following "The Librarian of Congress may sanction or remove a Copyright Royalty Judge . . . ." Without this restriction, we are confident that (so long as the Librarian is a Head of Department, which we address below) the CRJs will be inferior rather than principal officers. With unfettered removal power, the Librarian will have the direct ability to "direct," "supervise," and exert some "control" over the Judges' decisions. *Edmond*, 520 U.S. at 662-64. Although

individual CRJ decisions will still not be directly reversible, the Librarian would be free to provide substantive input on non-factual issues via the Register, whom the Judges are free to consult, 17 U.S.C. § 802(f)(1)(A)(i). This, coupled with the threat of removal satisfies us that the CRJs' decisions will be constrained to a significant degree by a principal officer (the Librarian). We further conclude that free removability constrains their power enough to outweigh the extent to which the scope of their duties exceeds that of the special counsel in *Morrison*. Cf. *Free Enterprise Fund*, 130 S. Ct. at 3162 ("Given that the [SEC] is properly viewed, under the Constitution, as possessing the power to remove Board members at will, and given the Commission's other oversight authority, we have no hesitation in concluding that under *Edmond* the [PCAOB] members are inferior officers . . . .").

In sum, the inability of the Librarian to remove the CRJs, coupled with the absence of a principal officer's direction and supervision over their exercise of authority, renders them principal officers—but obviously ones not appointed in the manner constitutionally required for such officers. Once the limitations on the Librarian's removal authority are nullified, they would become validly appointed inferior officers—at least if the Librarian is a Head of Department, the issue to which we now turn.

* * *

Intercollegiate argues that even if the CRJs are inferior officers, the Board's structure is unconstitutional because the Librarian is not a "Head of Department" within the meaning of the Appointments Clause. The Supreme Court addressed the same challenge as to the SEC Commissioners in *Free Enterprise Fund*; it ultimately held: "Because the Commission is a freestanding component of the Executive Branch, not subordinate to or contained within any other such

component, it constitutes a 'Departmen[t]' for the purposes of the Appointments Clause." 130 S. Ct. at 3163. See also *Freytag*, 501 U.S. at 915-22 (Scalia, J., concurring in part and concurring in judgment); *Buckley*, 424 U.S. at 127 ("Departments" referred to in the Appointments Clause "are themselves in the Executive Branch or at least have some connection with that branch"). Intercollegiate notes that we have referred to the Library of Congress as a "congressional agency," see *Keeffe v. Library of Congress*, 777 F.2d 1573, 1574 (D.C. Cir. 1985), and argues that it is not an executive department that can satisfy the "Head of Department" definition in *Free Enterprise Fund*.

Despite our language in *Keeffe*, the Library of Congress is a freestanding entity that clearly meets the definition of "Department." *Free Enterprise Fund*, 130 S. Ct. at 3162-63. To be sure, it performs a range of different functions, including some, such as the Congressional Research Service, that are exercised primarily for legislative purposes. But as we have mentioned, the Librarian is appointed by the President with advice and consent of the Senate, 2 U.S.C. § 136, and is subject to unrestricted removal by the President, *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839); *Kalaris v. Donovan*, 697 F.2d 376, 389 (D.C. Cir. 1983). Further, the powers in the Library and the Board to promulgate copyright regulations, to apply the statute to affected parties, and to set rates and terms case by case are ones generally associated in modern times with executive agencies rather than legislators. In this role the Library is undoubtedly a "component of the Executive Branch." *Free Enterprise Fund*, 130 S. Ct. at 3163. It was on this basis that the Fourth Circuit rejected a similar charge that the Librarian was not a "Head of Department" for purposes of appointing the Register. *Eltra Corp. v. Ringer*, 579 F.2d 294, 300-301 (4th Cir. 1978). We too hold that the Librarian is a Head of Department who may permissibly appoint the Copyright Royalty Judges.

\* \* \*

We hold that without the unrestricted ability to remove the Copyright Royalty Judges, Congress's vesting of their appointment in the Librarian rather than in the President violates the Appointments Clause.  Accordingly we invalidate and sever the portion of the statute limiting the Librarian's ability to remove the Judges.  Because the Board's structure was unconstitutional at the time it issued its determination, we vacate and remand the determination and do not address Intercollegiate's arguments regarding the merits of the rates set therein.

*So ordered.*