RECORDING INDUSTRY ASSOCIATION OF AMERICA, Petitioner,

v.

LIBRARIAN OF CONGRESS, Respondent.

Digital Cable Radio Associates, et al., Intervenors.

No. 98–1263.

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1999.

Decided May 21, 1999.

Robert A. Garrett argued the cause for petitioner. With him on the briefs was Cary H. Sherman. Eric A. Rubel entered an appearance.

Mark W. Pennak, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Frank W. Hunger, Assistant Attorney General, and William Kanter, Deputy Director.

Bruce D. Sokler, Fernando R. Laguarda, Joni Lupovitz and Jon L. Praed were on the brief for intervenors.

Before: EDWARDS, Chief Judge, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Under § 114(f) of the Copyright Act ("Act"), 17 U.S.C. §§ 101–1332, the Librarian of Congress is charged with establishing the rates and terms for compulsory licenses of certain subscription transmissions of digital audio music. In this first-ever proceeding under § 114, the Librarian determined that three music services subject to the terms of the license must pay the Recording Industry Association of America ("RIAA") 6.5 percent of their gross domestic residential revenues in exchange for the right to transmit digital audio music. The Librarian also imposed certain terms and conditions of operation on both RIAA and the music services. RIAA now challenges the 6.5 percent rate set by the Librarian, claiming that it is too low. RIAA also challenges the additional conditions imposed by the Librarian, i.e., conditions imposed on RIAA in its capacity as the collection agent for copyright owners.

The rate set by the Librarian survives challenge, because the Librarian's interpretation and application of the statute are permissible and consistent with established law. We reject the additional conditions imposed by the Librarian, however, for want of support in the record. The petition for review is denied in part and granted in part, and the case is hereby remanded.

## I. BACKGROUND

In 1990, digital audio services began transmitting sound recordings in the United States. At that time, United States copyright law did not recognize a performance right for sound recordings. As a result, digital audio services were not required to pay recording companies and recording artists for their performances; only the copyright owners of the notes and lyrics underlying sound recordings received a royalty for the transmission of any performance.

In 1995, Congress changed the copyright landscape by enacting the Digital Performance Right in Sound Recordings Act of 1995, Pub.L. No. 104–39, 109 Stat. 336, amending the Copyright Act. The new law afforded copyright owners a separate right to the performance of sound recordings via digital audio transmissions. *See* 17 U.S.C. § 106(6). This meant that certain digital music services would be required to pay recording companies and recording artists when they transmitted sound recordings. Although copyright owners now have protected interests under the 1995 law, they are nonetheless *required* to give licenses to those who seek to transmit sound recordings. The terms of licenses are either negotiated by the parties or set pursuant to arbitration. *See id.* § 114(f)(1).

Section 114 was amended on October 28, 1998 by the Digital Millennium Copyright Act, Pub.L. No. 105–304, 112 Stat. 2860, to distinguish between transmissions by preexisting subscription services, such as those operated by the services in this case, and eligible nonsubscription transmissions and new subscription services. However, the only changes brought by the 1998 law that are relevant to this proceeding are that § 114(f)(1) and (2) were renumbered to § 114(f)(1)(A) and (B), and the license period was extended from December 31, 2000 to December 31, 2001. *See* 17 U.S.C. § 114(f)(1)(A), (B).

On December 1, 1995, the Librarian published a notice signaling the commencement of a six-month period during which the parties could negotiate license agreements for the performance of sound recordings by digital audio transmission. *See Digital Performance Right in Sound Recordings,* 60 Fed.Reg. 61,655 (Dec. 1, 1995). If an understanding was reached, the Librarian could then issue a license reflecting the terms of the parties' agreement. *See* 17 U.S.C. § 114(f)(1)(A). In the absence of an agreement, those parties with a significant interest in the establishment of reasonable terms and rates for a § 114 license were to file a petition with the Copyright Office no later than August 1, 1996, requesting an arbitration before a copyright arbitration royalty panel pursuant to Chapter 8 of the Copyright Act. *See Digital Performance Right in Sound Recordings,* 60 Fed.Reg. at 61,656. Under the statute, an arbitration panel is authorized to set a "reasonable copyright royalty rate," which is "calculated to achieve" four statutory objectives. 17 U.S.C. § 801(b)(1). The four statutory objectives are:

(A) To maximize the availability of creative works to the public;

(B) To afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions;

(C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication;

(D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

*Id.*

When the parties in this case failed to reach an agreement during the six-month negotiation period, RIAA filed a petition

with the Copyright Office seeking arbitration. After determining that RIAA had a significant interest in the proposed proceeding, the Librarian convened a copyright arbitration royalty panel. Before the panel, RIAA sought a rate of 41.5 percent of the digital services revenue. The three music services appearing in the case, Digital Music Express, Digital Cable Radio Associates, and Muzak, L.P., urged a rate of 2.0 percent or less. After considering the evidence presented in light of the aforecited statutory objectives, the arbitration panel recommended a royalty rate of 5.0 percent of the services' gross domestic residential revenues and certain terms for payment and accounting for payments. *See Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings,* 63 Fed.Reg. 25,394, 25,396 (May 8, 1998).

The Register of Copyrights then reviewed the panel's determination. *See* 17 U.S.C. § 802(f) (requiring Register to review panel's decision and make recommendations to Librarian). The Register rejected the rate set by the panel, because she found that the use of a certain negotiated license fee as a starting point was arbitrary. *See* 63 Fed.Reg. at 25,399. The Register therefore reevaluated the record evidence and recommended a rate of 6.5 percent. *See id.* at 25,410. When setting this rate, the Register, like the panel, "considered the relevant marketplace points of reference offered into evidence." *Id.* at 25,409. She rejected RIAA's contention, however, that she must adopt "marketplace rates." *See id.* at 25,399–400. Moreover, unlike the panel, the Register "gave more consideration to the rates paid for the performance right in the musical compositions, because these rates represent an actual marketplace value for a public performance right in the digital arena, albeit not the digital performance right in sound recordings." *Id.* at 25,409.

In addition to finding the 6.5 percent rate appropriate, the Register accepted the panel's recommendation to designate a single entity, RIAA, to collect and distribute all royalty fees. *See id.* at 25,412. She also determined that there must be safeguards in place to monitor the functions of RIAA, since 10 percent of the affected copyright owners were not RIAA members. *See id.* She therefore recommended that the Librarian adopt terms that: (1) required each performance to be valued equally when royalties are paid to copyright owners, (2) permitted the copyright owners to audit RIAA's practices in handling the royalty fees, (3) specified the nature of the costs that RIAA may deduct from royalties before distribution, and (4) specified how "unknown copyright owners" should be treated in the distribution of royalties. *See id.* at 25,412–13.

On May 8, 1998, the Librarian accepted the Register's recommendations and, in accordance with those recommendations, adopted new regulations. *See id.* at 25,-413–15 (adopting 37 C.F.R. §§ 260.1 to 260.7). Particularly important here are the regulations that impose conditions on RIAA in its capacity as the sole collection and disbursement agent. Section 260.2(d) requires RIAA to value each performance equally when distributing royalties, § 260.3(d) dictates what costs RIAA may deduct from the royalties, § 260.6(b) allows "interested parties" to audit RIAA, and § 260.7 prescribes the way in which RIAA must deal with unknown copyright owners.

## II. ANALYSIS

### A. Standard of Review

We review the Librarian's interpretation of the relevant statutory provisions under the familiar two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

*Chevron* is principally concerned with whether an agency has authority to act under a statute. *See Chevron,* 467 U.S. at 842–45. Thus, a reviewing court's inquiry under *Chevron* is rooted in stat-

utory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference. *Id.* at 843–45, 865–66. . . . [T]he question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843.

*Arent v. Shalala,* 70 F.3d 610, 615 (D.C.Cir.1995).

As for rates and conditions established by the Librarian pursuant to § 114, the standard and scope of judicial review are as defined in 17 U.S.C. § 802(g):

[t]he court shall have jurisdiction to modify or vacate a decision of the Librarian only if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner.

■ The standard under § 802(g) is "exceptionally deferential," requiring the court to "uphold a royalty award if the Librarian has offered a facially plausible explanation for it in terms of the record evidence." *National Ass'n of Broadcasters v. Librarian of Congress,* 146 F.3d 907, 918 (D.C.Cir.1998) ("*NAB v. Librarian*").

### B. The 6.5 Percent Rate

■ The determination of appropriate rates for § 114 licenses is governed by 17 U.S.C. § 801(b):

Subject to the provisions of this chapter, the purposes of the copyright arbitration royalty panels shall be as follows:

(1) To make determinations concerning the adjustment of reasonable copyright royalty rates as provided in section[ ] 114 . . . and to make determinations as to reasonable terms and rates of royalty payments as provided in section 118. The rates applicable

under section[ ] 114 . . . shall be calculated to achieve the following objectives:

(A) To maximize the availability of creative works to the public;

(B) To afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions;

(C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication;

(D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

The Librarian argues that the term "reasonable copyright royalty rates" under § 801(b)(1) takes its meaning from the four statutory objectives under § 801(b)(1)(A)-(D). In other words, "reasonable rates" are simply those that are calculated to achieve the four objectives. Accordingly, the 6.5 percent rate in this proceeding was set only after it was determined that the rate would achieve the cited statutory objectives.

RIAA counters that the disputed statutory language unambiguously "imposes two separate requirements: the Section 114 rate must be (1) a 'reasonable copyright royalty rate' and (2) 'calculated to achieve' the Section 801(b)(1)(A)-(D) objectives." Reply Brief for Petitioner at 5. It claims that "reasonable copyright royalty rates" means a rate that affords fair market compensation. Recognizing that there is no such thing as a precise fair market compensation rate, RIAA argues that the Librarian must first determine the range of market rates that are appropriate and then select a rate from within the range of

fair market rates that meets the objectives of § 801(b)(1)(A)-(D). Only this interpretation, argues RIAA, gives meaning to both requirements.

In order for RIAA to succeed on this claim, it must show that, under step one of *Chevron*, Congress has clearly required the use of market rates in § 801(b)(1), or that, under step two of *Chevron*, the Librarian's interpretation is impermissible. RIAA fails both parts of the *Chevron* test.

RIAA's claim that the statute clearly *requires* the use of "market rates" is simply wrong. Section 801(b)(1) requires only that arbitration panels set "reasonable copyright royalty rates." The statute does not use the term "market rates," nor does it require that the term "reasonable rates" be defined as market rates. Moreover, there is no reason to think that the two terms are coterminous, for it is obvious that a "market rate" may not be "reasonable," and vice versa.

Furthermore, when Congress sought to require market rates in the Act, it used the term "market rate" or its equivalent. *See, e.g.,* 17 U.S.C. § 119(c)(3)(B) ("In determining royalty fees under this paragraph, the copyright arbitration royalty panel ... shall establish fees for the retransmission of network stations and superstations that most clearly represent the *fair market value* of secondary transmissions.") (emphasis added). Most strikingly, in the recent amendments to § 114(f), the Librarian is directed to "establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller" for the new categories of services. Pub.L. No. 105–304, 112 Stat. at 2896 (codified as 17 U.S.C. § 114(f)(2)(B)). Notably, the statutory criteria for establishing rates for preexisting services, such as those at issue here, remain unchanged, even though both subsections (f)(1) and (f)(2) were revised by the 1998 legislation and are virtually identical in all other aspects.

In sum, § 801(b)(1) does not clearly dictate the use of market rates when determining a "reasonable" royalty rate under § 114. Thus, under *Chevron* step two, the court must afford the Librarian deference if his interpretation is permissible. Here, the Librarian determined that "reasonable rates" are those that are calculated with reference to the four statutory criteria. This interpretation is not only permissible but, given that § 114 rates are to "be calculated to achieve" the four objectives of § 801(b)(1), it is the most natural reading of the statute. The Librarian's interpretation is therefore entitled to deference.

■ RIAA next argues that the Librarian also erred in setting the rate at 6.5 percent, because he failed to follow Copyright Royalty Tribunal precedent as required by 17 U.S.C. § 802(c). Prior to 1993, the Copyright Royalty Tribunal had jurisdiction to set rates and, in some cases, terms for each of the compulsory licenses and to distribute compulsory licensing royalties. In 1993, Congress abolished the Copyright Royalty Tribunal and most of its tasks are now performed by copyright arbitration royalty panels. *See NAB v. Librarian,* 146 F.3d at 912–13. Section 802(c) provides that copyright arbitration royalty panels "shall act *on the basis of,*" among other things, past Tribunal precedent. 17 U.S.C. § 802(c) (emphasis added). This court has held that it will "defer to the Librarian's reasonable and permissible interpretation of the requirements of subsection 802(c) under the second step of the *Chevron* analysis." *NAB v. Librarian,* 146 F.3d at 927.

In this case, the Librarian found that only two Tribunal decisions are relevant, because they are the only ones in which the § 801(b)(1) objectives applied while the Tribunal was still in operation. *See* 17 U.S.C. § 801(b) (1988 & Supp. IV 1992) ("Subject to the provisions of this chapter, the purposes of the Tribunal shall be ... to make determinations concerning the adjustment of reasonable copyright royalty rates as provided in sections 115 and 116,

and to make determinations as to reasonable terms and rates of royalty payments as provided in section 118. The rates applicable under sections 115 and 116 shall be calculated to achieve the following objectives."). Although RIAA argues that other decisions are also relevant, this argument is based on its belief that § 801(b)(1) requires two steps. Because it was reasonable for the Librarian to find that the term "reasonable copyright royalty rates" is defined by the four statutory objectives, there is no need to look to Tribunal precedent interpreting the term "reasonable rates" in other contexts.

Thus, the only relevant precedent, as the Librarian correctly points out, are those cases that interpreted the statutory language that is at issue here. Those two decisions are the Tribunal's § 115 decision, *Adjustment of Royalty Payable Under Compulsory License for Making and Distributing Phonorecords; Rates and Adjustment of Rates,* 46 Fed.Reg. 10,466 (Feb. 3, 1981), and its § 116 decision, *1980 Adjustment of the Royalty Rate for Coin–Operated Phonorecord Players,* 46 Fed. Reg. 884 (Jan. 5, 1981). With respect to the § 115 decision, RIAA argues that, because the Tribunal stated that a rate set above what the market could bear could not be reasonable, "[s]urely, if an above-market rate is not reasonable under Section 801(b)(1), a below market rate likewise is not reasonable; neither affords a fair return." Brief for Petitioner at 24. However, the § 115 decision was affirmed by this court specifically because the Tribunal had followed the statutory objectives. *See Recording Indus. Ass'n of America v. Copyright Royalty Tribunal,* 662 F.2d 1, 8–10 & n. 24 (D.C.Cir.1981) (noting that failure to consider the criteria would have been grounds for reversal). In this case, the Librarian relied on the statutory objectives in making his decision, and thus his action is consistent with the § 115 precedent. *See Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings,* 63 Fed.Reg. at 25,400. Moreover, the specific language

upon which RIAA relies simply went to whether a rate that was fixed *above* the market rate could be reasonable in the context of its rejection of the "bargaining room theory." *See Adjustment of Royalty Payable Under Compulsory License for Making and Distributing Phonorecords; Rates and Adjustment of Rates,* 46 Fed. Reg. at 10,478; *Recording Indus. Ass'n of America v. Copyright Royalty Tribunal,* 662 F.2d at 11–13 (finding that the Librarian's rejection of the "bargaining room theory" was reasonable, because "Congress had chosen to express its will through the statutory criteria" rather than adopting that theory as the basis for the rate). But there is no suggestion here that the rate has been set above the market value, nor is any question regarding the "bargaining room theory" presented. Accordingly, the specific language that RIAA relies upon is inapposite.

RIAA also argues that the Librarian failed to follow the holding of the Tribunal's § 116 decision. However, there is nothing in the § 116 decision that requires the use of market rates. To the contrary, the Tribunal specifically acknowledged that although "our rate cannot be directly linked to marketplace parallels, we find that they serve as an appropriate benchmark to be weighed together with the entire record and the statutory criteria." *1980 Adjustment of the Royalty Rate for Coin–Operated Phonorecord Players,* 46 Fed.Reg. at 888. In addition, the Seventh Circuit recognized, in affirming the § 116 decision, that the Tribunal, in arriving at its rate, "carefully weighed the evidence derived from the marketplace analogies and other evidence specifically in light of the four statutory criteria of section 801(b)." *Amusement and Music Operators Ass'n v. Copyright Royalty Tribunal,* 676 F.2d 1144, 1157 (7th Cir.1982). The Librarian interpreted this precedent to mean that marketplace analogies, along with other evidence, must be considered and a rate should then be chosen specifically based on the four statutory criteria.

*See Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings,* 63 Fed.Reg. at 25,400. Because this is a reasonable interpretation of the precedent, the Librarian has not violated § 802(c).

RIAA does not contest the evidence in support of the establishment of a 6.5 percent rate; it only argues that the Librarian erred in his interpretation of the statute and in his application of past precedent. Because we have found that the Librarian's interpretation of § 801(b)(1) is permissible and that he did not err in his application of past precedent, we deny RIAA's petition for review with respect to the establishment of a 6.5 percent rate.

## C. Conditions Imposed on RIAA

■ RIAA next argues that, after fixing a rate, the Librarian has no authority to impose terms on the RIAA collective. We disagree. Under the Act, the Librarian may impose terms "which . . . shall be binding on all copyright owners of sound recordings and entities performing sound recordings." 17 U.S.C. § 114(f)(1)(B). Although RIAA is not a copyright owner, it is the agent of the copyright owners, and, as such, acts on behalf of all copyright owners. Accordingly, RIAA may be bound by the Librarian's terms, just as copyright owners may be. Moreover, it is hard to imagine the imposition of a royalty rate without some indication as to how the money collected is to be allocated. In particular, because RIAA does not represent all copyright owners but will nevertheless collect and distribute royalties on behalf of all copyright owners, the Librarian obviously has the power to prescribe the allocations due to those who are not RIAA members.

■ We do agree, however, with RIAA's next argument that, even if the Librarian has the authority, the imposition of terms here was improper. The problem in this case is that there is no evidence in the record to support the terms imposed on RIAA.

This court has jurisdiction to vacate or modify an order of the Librarian "if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner." 17 U.S.C. § 802(g). Thus, the court is required to uphold an award only when "the Librarian's final award to a class claimant bears a rational relationship *to the record evidence,* is plausibly explained and is otherwise developed in a manner that does not plainly contravene applicable statutory provisions." *NAB v. Librarian,* 146 F.3d at 924 (emphasis added). It is not enough for the Librarian simply to offer a plausible explanation for his actions; there must be record evidence to support the terms imposed. Without record evidence to support his decision, we are constrained to find that the Librarian acted arbitrarily.

In this appeal, the Librarian concedes that there is no evidence in the record to support his decision with respect to the disputed terms; he argues, however, that his decision should be upheld because the terms, at least with respect to auditing, parallel the terms imposed on the music services for which there is evidentiary support in the record. *See* Brief for Respondent at 53–57. This argument does not hold water: the Librarian cannot assume, without any evidence to support his decision, that RIAA and the music services should be treated similarly. Moreover, the other terms imposed on RIAA are, in fact, quite different from those imposed on the music services, because of RIAA's very different role as the collection and distribution agent. Thus, the Librarian's decision cannot be upheld on this basis.

Next, the Librarian argues that he "*may* adopt . . . an unsupported Panel award if that decision *is* accompanied by an adequate 'explanation.'" Brief for Respondent at 56. In support, he cites the following passage from *NAB v. Librarian:* "For example, we think the Librarian would plainly act in an arbitrary manner if, without explanation or adjustment, he

adopted an award proposed by the Panel that was not supported by any evidence or that was based on evidence which could not reasonably be interpreted to support the award." 146 F.3d at 923. However, nowhere in the *NAB* opinion does the court state that it would allow the Librarian to act without regard to the record. To the contrary, the court's holding contradicts the Librarian's argument, because it specifically required the Librarian's award to bear "a rational relationship to the record evidence." *Id.* at 924.

There may be some circumstances in which the Librarian's decision must, for want of concrete data, be based principally on sound judgment. But even in these instances, a matter in dispute must be properly raised before the arbitration panel so that the parties have a fair opportunity to address it, and so that the Librarian has the benefit of the parties' views before reaching a judgment. There is no such record here. Indeed, at oral argument, counsel for the Librarian conceded that the copyright arbitration royalty panel prematurely ended its inquiry by failing to require the imposition of terms on RIAA and should have considered this issue. In the face of such a concession, we think it is clear that this portion of the proceeding must be remanded.

### III. Conclusion

For the foregoing reasons, we grant RIAA's petition for review with respect to the terms imposed under 37 C.F.R. §§ 260.2(d), 260.3(d), 260.6(b), and 260.7, and remand for further consideration of these matters. We deny RIAA's petition for review in all other respects.

*So ordered.*