NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**POLARIS INNOVATIONS LIMITED,**
*Appellant*

**v.**

**KINGSTON TECHNOLOGY COMPANY, INC.,**
*Appellee*

**UNITED STATES,**
*Intervenor*

---

2018-1831

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00116.

---

Decided:  January 31, 2020

---

MATTHEW D. POWERS, Tensegrity Law Group LLP, Redwood Shores, CA, argued for appellant.  Also represented by JENNIFER ROBINSON; AZRA HADZIMEHMEDOVIC, AARON MATTHEW NATHAN, SAMANTHA A. JAMESON, McLean, VA; NATHAN NOBU LOWENSTEIN, KENNETH J. WEATHERWAX, Lowenstein & Weatherwax LLP, Los Angeles, CA.

DAVID M. HOFFMAN, Fish & Richardson PC, Austin, TX, argued for appellee. Also represented by MICHAEL JOHN BALLANCO, Washington, DC; NITIKA GUPTA FIORELLA, Wilmington, DE.

MELISSA N. PATTERSON, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for intervenor. Also represented by COURTNEY DIXON, DENNIS FAN, SCOTT R. MCINTOSH, JOSEPH H. HUNT; THOMAS W. KRAUSE, JOSEPH MATAL, FARHEENA YASMEEN RASHEED, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

————————————

Before REYNA, WALLACH, and HUGHES, *Circuit Judges.*

Opinion for the court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* HUGHES, in which *Circuit Judge* WALLACH joins.

PER CURIAM.

In its opening brief, Polaris Innovations Limited argues that the final written decision at issue in this appeal exceeds the scope of the Patent Trial and Appeal Board's authority and violates the Constitution's Appointments Clause. *See* Appellant's Br. 53 (citing U.S. Const. art. II, § 2, cl. 2). This court recently decided this issue in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). Accordingly, the Board's decision in No. IPR2017-00116 is vacated, and the case is remanded to the Board for proceedings consistent with this court's decision in *Arthrex*.

**VACATED AND REMANDED**

COSTS

No costs.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**POLARIS INNOVATIONS LIMITED,**
*Appellant*

**v.**

**KINGSTON TECHNOLOGY COMPANY, INC.,**
*Appellee*

**UNITED STATES,**
*Intervenor*

_____

2018-1831

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00116.

_____

HUGHES, *Circuit Judge*, concurring, in which WALLACH, *Circuit Judge*, joins.

I concur because we are bound by the prior panel decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d

1320 (Fed. Cir. 2019).[1]  However, I write separately to note that I disagree with the merits and question the remedy of the *Arthrex* panel decision.  I believe that viewed in light of the Director's significant control over the activities of the Patent Trial and Appeal Board and Administrative Patent Judges, APJs are inferior officers already properly appointed by the Secretary of Commerce.

But if APJs are properly considered principal officers, I have grave doubts about the remedy *Arthrex* applied to fix their unconstitutional appointment.  In the face of an unconstitutional statute, our role is to determine whether severance of the unconstitutional portion would be consistent with Congress's intent.  Given the federal employment protections APJs and their predecessors have enjoyed for more than three decades, I find no legislative intent to divest APJs of their Title 5 removal protections to cure any alleged constitutional defect.  Because the bar to find non-severability is so high, though, I reluctantly agree with *Arthrex*'s remedy.

I

None of the parties here or in *Arthrex* dispute that APJs are officers who exercise "significant authority pursuant to the laws of the United States."  *Buckley v. Valeo*,

---

[1]    The parties have raised the same arguments on the merits of the Appointments Clause issue in both *Polaris* cases before this panel, Nos. 2018-1768 and 2018-1831.  However, the government contends that Polaris waived its Appointments Clause challenge in No. 2018-1768 because it failed to make the argument before the Board in the first instance.  I need not address the waiver issue because this concurrence addresses only the merits of the Appointments Clause argument.  And I address this concurrence to No. 2018-1831 because the parties agree the issue was preserved there.

424 U.S. 1, 126 (1976) (per curiam). But "significant authority" marks the line between an officer and an employee, not a principal and an inferior officer. Despite being presented with the opportunity to do so, the Supreme Court has declined to "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond v. United States*, 520 U.S. 651, 661 (1997).

Instead, the pertinent cases make clear that the hallmark of an inferior officer is whether a presidentially-nominated and senate-confirmed principal officer "direct[s] and supervise[s] [her work] at some level." *Id.* at 663. *Edmond* does not lay out a more exacting test than this, and we should not endeavor to create one in its stead. The cases employ an extremely context-specific inquiry, which accounts for the unique systems of direction and supervision in each case. *See infra* Section I. Finally, *Edmond* also makes clear that the Appointments Clause seeks to "preserve political accountability relative to important government assignments." 520 U.S. at 663. The current structure for appointing, directing and supervising, and removing APJs allows such political accountability through the Director's significant, substantive supervision of APJs' work, and the ability to discipline and terminate APJs to promote the efficiency of the service.

*Arthrex,* in my view, pays insufficient attention to the significant ways in which the Director directs and supervises the work of the APJs and, instead, focuses on whether the Director can single-handedly review and reverse Board decisions, and whether APJs are removable at will. In doing so, the *Arthrex* panel essentially distills the Supreme Court's direction and supervision test into two discrete questions: (1) are an officer's decisions reviewable by a principal officer and (2) is the officer removable at will? Because I believe that the Supreme Court would have announced such a simple test if it were proper, I respectfully disagree with the *Arthrex* panel decision that APJs are

principal officers.  The Director's power to direct and supervise the Board and individual APJs, along with the fact that APJs are already removable under the efficiency of the service standard, suffices to render APJs inferior officers.

A

The Director may issue binding policy guidance, institute and reconsider institution of an *inter partes* review, select APJs to preside over an instituted *inter partes* review, single-handedly designate or de-designate any final written decision as precedential, and convene a panel of three or more members of his choosing to consider rehearing any Board decision.  The *Arthrex* panel categorized some of these as "powers of review" and others as "powers of supervision," but I view them all as significant tools of direction and supervision.

As *Arthrex* recognized, "[t]he Director is 'responsible for providing policy direction and management supervision' for the [United States Patent and Trademark Office]."  941 F.3d at 1331 (quoting 35 U.S.C. § 3(a)(2)(A)).  Not only can the Director promulgate regulations governing *inter partes* review procedures, but he may also prospectively issue binding policy guidance "interpreting and applying the patent and trademark laws."  Gov't. Br. 21.  APJs must apply this guidance in all subsequent *inter partes* review proceedings.  Such guidance might encompass, for instance, exemplary application of the law to specific fact patterns, such as those posed in pending cases.  These powers provide the Director with control over the process and substance of Board decisions. Gov't. Br. 8, 21.  And though the Director cannot directly reverse an individual Board decision that neglects to follow his guidance, APJs who do so risk discipline or removal under the efficiency of the service standard applicable under Title 5.  *See infra* Section I C.  Such

binding guidance, and the consequences of failing to follow it, are powerful tools for control of an inferior officer.[2]

The Director also has unreviewable authority to institute *inter partes* review. 35 U.S.C. § 314(a), (d). *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 504 (2010) (discussing the importance of the ability to "start, stop, or alter individual [PCAOB] investigations," even where the reviewing principal officer already had significant "power over [PCAOB] activities"). Though the *Arthrex* panel did not address the Director's ability to reconsider an institution decision, our precedent also holds that the Board[3] may reconsider and reverse its initial institution decision. *See, e.g.*, *Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*, 839 F.3d 1382, 1385−86 (Fed. Cir. 2016) (explaining that "§ 318(a) contemplates that a proceeding can be 'dismissed' after it is instituted, and, as our prior cases have held, administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so" (internal quotation and citation omitted)).

The Director also controls which APJs will hear any given instituted *inter partes* review. 35 U.S.C. § 6(c). In

---

[2]  To be sure, I do not mean to suggest that the Director's extensive powers of supervision mean that he can dictate the outcome of a specific *inter partes* proceeding. Rather, his ability to issue guidance and designate precedential opinions provides the general type of supervision and control over APJs' decision-making that renders them inferior, not principal, officers.

[3]  The Director's delegation of his institution power to the Board does not diminish its existence. 37 C.F.R. § 42.4(a) (stating that "[t]he Board institutes the trial on behalf of the Director"). *See also Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1033 (Fed. Cir. 2016).

my view, this power of panel designation is a quintessential method of directing and controlling a subordinate. Importantly, I do not believe that in stating that the power to remove an officer at-will from federal employment is "a powerful tool for control of an inferior," *Free Enterprise*, 561 U.S. at 510 (internal quotation omitted), the Supreme Court meant that such removal power is the only effective form of control in the context of the Appointments Clause. For example, the Judge Advocate General in *Edmond* could remove the Court of Criminal Appeal judges from judicial service without cause, but not necessarily federal employment altogether. *Edmond*, 520 U.S. at 664. *See also Free Enterprise*, 561 U.S. at 510 (relying on both at-will removal authority and "the [SEC's] other oversight authority" in finding with "no hesitation" that the PCAOB members are inferior officers). That is akin to the Director's authority to designate which APJs will consider a certain case. And despite acknowledging that "when a statute is silent on removal, the power of removal is presumptively incident to the power of appointment[,]" the *Arthrex* panel declined to opine on the Director's ability to de-designate APJs from a panel under § 6(c). *Arthrex*, 941 F.3d at 1332. But *Edmond* referenced the ability to remove the judges there "from [their] judicial assignment[s]," followed by a recognition of the potent power of removal. 520 U.S. at 664. If the Director's ability to control APJs plays a significant part in the unconstitutionality at issue, such that the remedy is to make APJs removable at will, the panel should have definitively addressed the Director's de-designation authority. Moreover, as outlined in Section I C, *infra*, APJs already may be disciplined or removed from federal employment under the routine efficiency of the service standard, which is not incompatible with discipline or removal for failing to follow the Director's binding guidance.

And the Director may continue to provide substantial direction and supervision after the Board issues its final written decision. As *Arthrex* discusses, the Director may

POLARIS INNOVATIONS LIMITED v. KINGSTON TECHNOLOGY      7
CO. INC.

convene a Precedential Opinion Panel (POP), of which the Director is a member, to consider whether to designate a decision as precedential. *Arthrex*, 941 F.3d at 1330. But I read the Standard Operating Procedures more broadly, such that the Director may also make a precedential designation or de-designation decision single-handedly,[4] thereby unilaterally establishing binding agency authority on important constitutional questions and other exceptionally important issues. Standard Operating Procedure 2, at 3–4. Indeed, it appears that the Director has done so in at least sixteen cases in 2018 and 2019. *See* USPTO, *Patent Trial and Appeal Board Precedential and informative decisions, available at* https://www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/precedential-informative-decisions (listing decisions designated as precedential in the past year, where some are labeled as "Precedential Opinion Panel decision" and others are not). The Director may also convene a POP of his choice, of which he is by default a member, to consider whether to rehear and reverse any opinion. Standard Operating Procedure 2, at 4. And, the Director may "determine that a panel of more than three members is appropriate" and then choose those additional members as well. *Id.* Though the *Arthrex* panel recognized these powers, it dismissed them because the Director has only one vote out of at least three. 941 F.3d at

---

[4]    "No decision will be designated or de-designated as precedential or informative without the approval of the Director. This SOP does not limit the authority of the Director to designate or de-designate decisions as precedential or informative, or to convene a Precedential Opinion Panel to review a matter, in his or her sole discretion without regard to the procedures set forth herein." Patent Trial and Appeal Board, Standard Operating Procedure 2 (Revision 10) at 1 (Standard Operating Procedure 2), *available at* https://www.uspto.gov/sites/default/files/documents/SOP 2%20R10%20FINAL.pdf.

1331–32.  This assessment, however, fails to recognize the practical influence the Director wields with the power to hand-pick a panel, particularly when the Director sits on that panel.  The Director's ability to unilaterally designate or de-designate a decision as precedential and to convene a POP of the size and composition of his choosing are therefore important tools for the direction and supervision of the Board even after it issues a final written decision.[5]

---

[5]      The *Arthrex* panel's underestimation of the Director's power is particularly evident in light of this court's prior *en banc* decision in *In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994), *abrogated on other grounds by In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008).  *Alappat* contained strong language about the ability to control the composition and size of panels.  *See, e.g.*, *id.* at 1535 (noting that "the Board is merely the highest level of the Examining Corps, and like all other members of the Examining Corps, the Board operates subject to the Commissioner's overall ultimate authority and responsibility").  While the duties of the Board and the Director have changed since *Alappat* was decided, the authority to determine the Board's composition for reconsideration of an examiner's patentability determination mirrors the current authority with respect to *inter partes* review.  *Compare* 35 U.S.C. § 6(c) (2012) (giving the Director authority to designate "at least 3 members of the Patent Trial and Appeal Board" to review "[e]ach appeal, derivation proceeding, post-grant review, and inter partes review"), *with* 35 U.S.C. § 7(b) (1988) (giving the Commissioner power to designate "at least three members of the Board of Appeals and Interferences" to review "adverse decisions of examiners upon applications for patents").  Therefore, I believe the panel should have at least discussed how *Alappat*'s view of the power to control the Board might impact the Appointments Clause analysis.

Combined, all of these powers illustrate that the Director has constitutionally significant means of direction and supervision over APJs—making them inferior officers under the rule of *Edmond*.

B

Despite the Director's significant powers of direction and supervision, the *Arthrex* panel concluded that APJs are principal officers in large part because no principal officer may "single-handedly review, nullify or reverse" the Board's decisions. *Arthrex*, 941 F.3d at 1329. But Supreme Court precedent does not require such power. And in the cases in which the Court emphasized a principal officer's power of review, that principal officer had less authority to direct and supervise an inferior officer's work ex ante than the Director has here.

In *Edmond*, for instance, the Court of Appeals for the Armed Forces, an Article I court, could review decisions of the Court of Criminal Appeals judges at issue. However, its scope of review was limited. *Edmond*, 520 U.S. at 665 (explaining that the Court of Appeals for the Armed Forces may only reevaluate the facts when there is no "competent evidence in the record to establish each element of the offense beyond a reasonable doubt"). And while the Judge Advocate General "exercise[d] administrative oversight" and could "prescribe uniform rules of procedure," he could "not attempt to influence (by threat of removal or otherwise) the outcome of individual proceedings." *Id.* at 664. Nonetheless, the Supreme Court found that the Court of Criminal Appeals judges were inferior, not principal, officers. In comparison, while the Director may not unilaterally decide to rehear or reverse a Board decision, he has many powers to direct and supervise APJs both ex ante and ex post, Section I A, *supra*, that no principal officer had in *Edmond*.

Similarly, in *Freytag v. Comm'r*, 501 U.S. 868 (1991), the Supreme Court considered the status of special trial

judges appointed by the Tax Court, whose independent decision-making varied based on the type of case before them. The Court held that the special trial judges were inferior officers—not employees—when presiding over "declaratory judgment proceedings and limited-amount tax cases" because they "render[ed] the decisions of the Tax Court" in those cases. *Id.* at 882. In doing so, the Court distinguished between cases in which the special trial judges acted as "inferior officers who exercise independent authority," and cases in which they still had significant discretion but less independent authority. *Id.* The Court's analysis distinguished between inferior officer and employee; nowhere did the Court suggest that special trial judges' "independent authority" to decide declaratory judgment proceedings and limited-amount cases rendered them principal officers. *See id.* at 881−82. Most recently, the Court applied the framework of *Freytag* in deciding whether administrative law judges (ALJs) of the Securities and Exchange Commission (SEC) are inferior officers or employees. *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2053 (2018). The Court reasoned that SEC ALJs and *Freytag*'s special trial judges are extremely similar, but SEC ALJs arguably wield more power because their decisions become final if the SEC declines review. *Id.* at 2053−54. But again, the Court found this structure still only rendered SEC ALJs officers, not employees. *Id.* at 2054. No mention was made of SEC ALJs being principal officers.[6] *See id.* at 2051 n.3 (explaining that the distinction between principal and inferior officers was "not at issue here"). Just as the special

---

[6]    In fact, the Court declined "to elaborate on *Buckley*'s 'significant authority' test" marking the line between officer and employee, citing two parties' briefs which argued that the test between officer and employee, not principal and inferior officer, should include some measure of the finality of decision making. *Lucia*, 138 S. Ct. at 2051−52.

trial judges in *Freytag* and the SEC ALJs in *Lucia* were inferior officers, so too are APJs.

Nor does this court's precedent require unfettered review as a marker of inferior officer status. In *Masias v. Sec'y of Health & Human Servs.*, we rebuffed the argument that because the Court of Federal Claims does not review decisions of the Vaccine Program's special masters de novo, the special masters are principal officers. 634 F.3d 1283, 1293−94 (Fed. Cir. 2011). There, we recognized that the Court of Federal Claims may only "set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* at 1294. This limited review means that many of the special masters' decisions are effectively final because the Court of Federal Claims has no basis to set aside findings of fact or conclusions of law. We reasoned that such limited review of special masters' decisions by the Court of Federal Claims resembled the review in *Edmond*, and that "the fact that the review is limited does not mandate that special masters are necessarily 'principal officers.'" *Id.* at 1295.

Finally, the panel analogized the *Arthrex* issue to the one addressed by the D.C. Circuit in *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012). *See Arthrex*, 941 F.3d at 1334. But the facts of *Intercollegiate* are significantly different than those in *Arthrex*, or here. The Librarian of Congress—the principal officer who supervises the Copyright Royalty Judges (CRJs) at issue—was much more constrained in her ability to direct and supervise the CRJs than the Director. The governing statute grants CRJs broad discretion over ratemaking. *See* 17 U.S.C. § 802(f)(1)(A)(i) (stating that "[CRJs] shall have full independence in making" numerous copyright rate-related decisions). The Librarian "approv[es] the CRJs' procedural regulations, . . . issu[es] ethical rules for the CRJs, [and] . . . oversee[s] various logistical aspects of their duties," such as publishing CRJs'

decisions and providing administrative resources. *Intercollegiate*, 684 F.3d at 1338. In fact, it appears the only way the Librarian can exercise substantive control over the CRJs' ratemaking decisions is indirectly through the Register of Copyrights, whom she, not the President, appoints. *See* 17 U.S.C. § 701(a). The Register corrects any legal errors in the CRJs' ratemaking decisions, 17 U.S.C. § 802(f)(1)(D), and provides written opinions to the CRJs on "novel question[s] of law," 17 U.S.C. § 802(f)(1)(B), or when the CRJ requests such an opinion. 17 U.S.C. § 802(f)(1)(A)(ii). But the CRJs may not consult with the Register about a question of fact. 17 U.S.C. § 802(f)(1)(A)(i). The Librarian therefore exerts far less control over CRJs than the Director can over APJs using all the powers of direction and supervision discussed in Section I A, *supra*.

The ill-suited comparison to *Intercollegiate* in *Arthrex* again highlights how the unique powers of direction and supervision in each case should be viewed in totality, rather than as discrete categories weighing in favor of inferior officer status or not. In particular, by breaking up the analysis into three discrete categories—Review, Supervision, and Removal—the *Arthrex* panel overlooks how the powers in each category impact each other. Again, for example, whereas ex post the Court of Appeals for the Armed Forces has more power to review the Court of Criminal Appeals judges' decisions than the Director has to review a Board decision, neither the JAG nor the Court of Appeals for the Armed Forces have the Director's ex ante control, such as the power to decide whether to hear a case at all or to issue binding guidance on how to apply the law in a case. Viewed through this integrated lens, I believe APJs comfortably fit with prior Supreme Court precedent that has never found a principal officer in a challenged position to date.

C

Finally, to the extent that the *Arthrex* panel decision is based on the lack of review along with perceived impermissible restrictions on removal of APJs, I believe it misapprehends the applicable efficiency of the service standard that protects APJs.  The efficiency of the service standard allows discipline and removal for "misconduct [that] is likely to have an adverse impact on the agency's performance of its functions."  *See Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000).  To be sure, the efficiency of the service standard does not allow discipline or removal of APJs "without cause," as in *Edmond. See Arthrex*, 941 F.3d at 1333.  But neither the Supreme Court nor this court has required that a civil servant be removable at will to qualify as an inferior officer.  To the contrary, the Supreme Court and this court have upheld for-cause removal limitations on inferior officers.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 692−93 (1988) (holding that the "good cause" restriction on removal of the independent counsel, an inferior officer, is permissible); *Masias*, 634 F.3d at 1294 (stating that the Court of Federal Claims can remove special masters for "incompetency, misconduct, or neglect of duty or for physical or mental disability or for other good cause shown").  *See also Free Enterprise*, 561 U.S. at 494 (explaining that the Court previously "adopted verbatim the reasoning of the Court of Claims, which had held that when Congress ' "vests the appointment of inferior officers in the heads of Departments[,] it may limit and restrict the power of removal as it deems best for the public interest' " (alteration in original) (quoting *United States v. Perkins*, 116 U.S. 483, 485 (1886) (itself quoting *Perkins v. United States*, 20 Ct. Cl. 438, 444 (1885)))).

The efficiency of the service standard allows supervisors to discipline and terminate employees for arguably even a wider range of reasons than the standards above, including failure or refusal to follow the Director's policy or legal guidance.  Together with the significant authority the

Director wields in directing and supervising APJs' work, the ability to remove an APJ on any grounds that promote the efficiency of the service supports finding that APJs are inferior officers.

## II

Assuming for the sake of argument that APJs are principal officers, a remedy is required to cure the constitutional violation arising from their present appointment scheme. However, I do not believe that the remedy proposed by the *Arthrex* panel comports with congressional intent as evidenced by the employment protections provided to APJs and their predecessors for over thirty years. The *Arthrex* panel makes APJs removable at will by partially severing 35 U.S.C. § 3(c) as it applies Title 5's removal protections to APJs. *Arthrex*, 941 F.3d at 1337–38. I question whether Congress would have wanted to leave APJs without the removal protections of Title 5. But, given the high standard for finding non-severability, I cannot say that the *Arthrex* panel's remedy was improper.

## A

Before proceeding to the traditional severance analysis, I must note several concerns about the panel's purported "severance." In traditional severance cases, both the unconstitutional language being severed and the remaining language are usually part of one statute enacted at the same time. In what appears to be a smaller number of cases, an unconstitutional amendment was severed from the original statute. *E.g.*, *Reitz v. Mealey*, 314 U.S. 33, 38–39 (1941), *overruled in part on other grounds by Perez v. Campbell*, 402 U.S. 637 (1971). But here the "severance" is far more convoluted—to the extent that I question whether "severance" is even the appropriate characterization of the *Arthrex* remedy.

A court may sever the application of a particular statute without striking language explicitly. *See, e.g., Nat'l*

*Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 586 (2012) (invalidating the application of a statute to cure a constitutional defect). But the *Arthrex* panel did not simply sever the application of 35 U.S.C. § 3(c) to APJs. It severed § 3(c)'s application of Title 5 protections, but only with respect to Title 5's removal protections, and only to APJs. *See Arthrex*, 941 F.3d at 1337–38. In doing so, it severed the application of a separate statute, indeed, a section in a separate title of the United States Code. *Id.* Further, the Title 5 employment protections afforded by 35 U.S.C. § 3(c) already existed when Congress significantly amended other portions of Title 35, but made no changes to § 3(c), with the America Invents Act in 2011. *See infra* Section II C. I question whether it is appropriate to solve the alleged constitutional infirmity at issue in *Arthrex* and in this case by severing the application of a statute that Congress left untouched in its most recent revision, the substance of which had applied in various forms for over 30 years. *See infra* Section II B.

B

When faced with an unconstitutional statute, we must determine whether severing the offending portion is possible. To do so, we must determine if the remaining statute "will function in a manner consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis removed).

The question of severability is a weighty one and the bar for finding an unconstitutional provision non-severable is high. We "must refrain from invalidating more of the statute than is necessary. Indeed, we must retain those portions of the Act that are (1) constitutionally valid, (2) capable of 'functioning independently,' and (3) consistent with Congress' basic objectives in enacting the statute." *United States v. Booker*, 543 U.S. 220, 258–59, (2005) (internal citations omitted).

Because the statute as severed by *Arthrex* can function independently and is constitutionally valid, the key question is whether the statute as excised "remains consistent with Congress' initial and basic . . . intent." *Id.* at 264. Here, I question whether the *Arthrex*-excised statute does so. Congress afforded federal employment protections to APJs and their predecessors for over thirty years. And it seems unlikely to me that Congress, faced with this Appointments Clause problem, would have chosen to strip APJs of their employment protections, rather than choose some other alternative. However, because the bar for non-severability is so high, and Congress can, at the end of the day, make another legislative choice if it disagrees with the outcome here, I reluctantly conclude that § 3(c) can be severed as it applies to the removal protections for APJs.

To be sure, I do not question the ability to sever an unconstitutional provision lightly. But our touchstone must remain the intent of Congress, and in this case, Congress has maintained federal employment protections for USPTO officers and employees, including APJs and their predecessors, from 1975 to today. This long-standing statutory protection leads me to believe that Congress intended for APJs to have removal protections, such as those incorporated through Title 5 in 35 U.S.C. § 3(c), regardless of changes made to the Board's duties in the AIA.

C

As the *Arthrex* panel noted, examiners-in-chief—"the former title of the current APJs"—were in fact nominated by the President and confirmed by the Senate until 1975. *Arthrex*, 941 F.3d at 1344. *See also* 35 U.S.C. § 3 (1952). But the 1975 amendment did not simply remove Presidential nomination and Senate confirmation; it instead provided for the appointment of examiners-in-chief (1) by the Secretary of Commerce (2) "under the classified civil service." An Act To Amend Title 35, United States Code, "Patents", and For Other Purposes, Pub. L. No. 93–601, secs.

POLARIS INNOVATIONS LIMITED v. KINGSTON TECHNOLOGY    17
CO. INC.

1–2, §§ 3, 7, 88 Stat. 1956, 1956 (1975) (codified as amended at 35 U.S.C. §§ 3, 7 (1976)). This amendment provided federal employment protections to examiners-in-chief. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 150–51 (1974), *overruled in part on other grounds by Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (explaining that the Lloyd-LaFollette Act's "efficiency of the service" standard governed the dismissal of a competitive civil service employee); *Cole v. Young*, 351 U.S. 536, 543 (1956) (describing dismissal of federal employees as governed by "general personnel laws," such as the Lloyd-LaFollette Act's "efficiency of the service" standard).

Two reasons for this change appear in the legislative history. First, due to the growing number of examiners-in-chief, Presidential nomination and Senate confirmation posed a "burden." H.R. REP. NO. 93-856, at 2 (1974). In an early case discussing the Appointments Clause, the Supreme Court said that this was exactly the reason for providing for appointment of inferior officers by people other than the President. *United States v. Germaine*, 99 U.S. 508, 509–10 (1878). Second, the position of examiner-in-chief "requir[es] unique legal and technical qualifications and experience." An Act To Amend Title 35, United States Code, "Patents", and For Other Purposes: Hearing on S. 645, H.R. 5237, S. 1253 and S.1254 Before Subcomm. No. 3 of the H. Comm. on the Judiciary, 92d Cong. 28−29 (1974) (letter from William N. Letson, Acting General Counsel of the Dep't of Commerce, to Emanuel Celler, Chairman of the H. Comm. on the Judiciary). In making this change, Congress implicitly recognized that APJs belonged in the civil service, where expertise and nonpartisan decision-making are expected of all civil servants. Indeed, such ideas motivated the passage of the Civil Service Reform Act (CSRA) only three years after Congress provided for the appointment of APJs through the civil service system. *Lovshin v. Dep't of Navy*, 767 F.2d 826, 832 (Fed. Cir. 1985) (citing the Senate's discussion of the public's right to

a government that is both "efficient and effective" and "impartially administered").

Congress then maintained these federal employment protections through several amendments over more than three decades. In 1985, Congress amended 35 U.S.C. § 7, creating the Board of Patent Appeals and Interferences (BPAI) from the existing Board of Appeals, and again provided that the examiners-in-chief "shall be appointed to the competitive service."[7]    Patent Law Amendment Acts of 1984, Pub. L. 98–622, title II, sec. 201, § 7(a), 98 Stat. 3383, 3386 (1984) (codified as amended at 35 U.S.C. § 7 (1988)). Though the 1978 CSRA replaced the Lloyd-LaFollette Act between the 1975 and 1985 amendments to 35 U.S.C. § 7, the CSRA maintained the "efficiency of the service" standard for discipline and dismissal of federal employees in the competitive service. 5 U.S.C. § 7513 (1978). S*ee also Cornelius v. Nutt*, 472 U.S. 648, 669 (1985) ("The statutory phrase 'such cause as will promote the efficiency of the service' pre-dates the Civil Service Reform Act's recognition of federal sector collective bargaining.") (Marshall, J., dissenting).

In 1999, Congress made four changes significant here. First, Congress modified the statutory language governing the BPAI, moving the Board's governing language from § 7 to its current location in § 6. *See* Patent and Trademark Office Efficiency Act, Pub. L. 106–113, ch. 1, sec. 4717, 113 Stat. 1501, 1501A-580 (1999) (codified at 35 U.S.C. § 6 (2000)). Second, it introduced the terminology of administrative patent judge, in place of examiners-in-chief. *Id.* at 1501A-580–81.    Third, Congress removed the previous

---

[7]    For the Appointments Clause analysis here, I treat the terms "competitive service" and "classified civil service" as interchangeable. *See, e.g.*, 5 U.S.C. § 2102(c) (2018) ("As used in other Acts of Congress, 'classified civil service' or 'classified service' means the 'competitive service[.]'").

language appointing examiners-in-chief under the competitive service, but added the current § 3(c), giving Title 5 protections to USPTO employees and officers. *Id.* at sec. 4713, § 3(c), 113 Stat. at 1501A-577 (codified as amended at 35 U.S.C. § 3(c) (2000)). This meant that even though their title changed, APJs remained subject to discipline or dismissal subject to the efficiency of the service standard. *See* 5 U.S.C. § 7513 (2000). Fourth, the amendment transferred the power to appoint APJs from the Secretary of Commerce to the Director. Patent and Trademark Office Efficiency Act, Pub. L. 106–113, ch. 1, sec. 4717, 113 Stat. 1501, 1501A-581 (1999) (codified at 35 U.S.C. § 6(a) (2000)).

This fourth change is particularly significant because only a few years later, Congress explicitly considered the constitutionality of this choice—whether APJs were employees that could be appointed by the Director or officers that must be appointed by the Secretary of Commerce. Congress chose the latter. Consideration of this issue was prompted by an intellectual property law scholar's suggestion in 2007 that APJs were inferior officers, not employees, and therefore must be appointed by the President, a Court of Law, or the Head of a Department. *See* John F. Duffy, *Are Administrative Patent Judges Unconstitutional?*, 2007 PATENTLY-O PAT. L.J. 21, 25 (2007). Congress responded swiftly, amending the law in 2008 to give the power to appoint APJs back to the Secretary of Commerce. Patent and Trademark Administrative Judges Appointment Authority Revision, Pub. L. 110–313, sec. 1, § 6, 122 Stat. 3014, 3014 (2008) (codified as amended at 35 U.S.C. § 6(a) (2012)). While some legislators viewed the fix as unnecessary, none suggested that APJs were in fact principal officers appointable only by the President. *Compare* 154 Cong. Rec. H7234 (daily ed. Jul. 29, 2008 edition) (statement of Rep. King) ("[A] straightforward reading of article II, section 2, which I strongly endorse, suggests the 1999 authority that Congress bestowed on the Patent and

Trademark Office Director to appoint administrative law judges is unconstitutional, inconsistent with article II, section 2.  Instead, this right is more properly reserved for . . . the Secretary of Commerce . . . ."), *with id.* (statement of Rep. Cohen) ("We firmly believe that appointments made by the Director are constitutional.").   That Congress explicitly considered the constitutionality of APJ appointments just four years before passing the AIA, and confirmed their appointment by the Head of a Department, strongly suggests that Congress believed APJs were inferior officers in 2000, 2007, and 2011, and thus, could be constitutionally appointed by the Secretary, even with restrictions on their removal.

Finally, though Congress made significant changes to Title 35 through the AIA, it did not modify § 3(c)'s application of Title 5 protections to USPTO employees and officers.[8]  35 U.S.C. § 3(c) (2012).  Yet again, APJs remained subject to the efficiency of the service removal standard applicable to many federal employees.

Further confirmation regarding Congressional intent comes from the fact that § 3 provides specific, and limited, removal procedures for the Director and the Commissioner for Patents, as opposed to all other officers and employees subject to § 3(c).  The Director may be removed only by the President.  35 U.S.C. § 3(a)(4).  The Commissioner may be removed "for misconduct or nonsatisfactory performance" under her performance agreement, "without regard to the provisions of title 5."  35 U.S.C. § 3(b)(2)(C).  That Congress described specific removal procedures for these two

---

[8]    The AIA did amend 35 U.S.C. § 3(b), *see* Leahy-Smith America Invents Act, Pub. L. 112-29, sec. 21, § 3(b), 125 Stat. 284, 336 (2011) (governing the Director's ability to fix pay for APJs), and 35 U.S.C. § 3(e)(2), *id.* at sec. 20 § 3(e)(2), 125 Stat. at 334 (technical amendment changing "this Act" to "that Act").

positions strongly implies it intended that all other USPTO employees and officers enjoy the Title 5 protections provided in § 3(c).

Given this unbroken line of federal employment protection afforded to APJs and their predecessors for over three decades, I question whether severing § 3(c)'s Title 5 removal protections for APJs "remains consistent with Congress' initial and basic . . . intent." *Booker,* 543 U.S. at 264. My concerns are not alleviated by the *Arthrex* panel's focus on Congress's intent as it pertained to the importance of *inter partes* review, without considering why Congress chose to provide Title 5 employment protections to APJs for decades. *See Arthrex*, 941 F.3d at 1337–38.

### D

Finally, I am mindful of the Supreme Court's guidance that:

> Our ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly we have already articulated the background constitutional rules at issue and how easily we can articulate the remedy. . . . But making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a 'far more serious invasion of the legislative domain' than we ought to undertake.

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 n.26 (1995)). Given the limited extent of Appointments Clause jurisprudence and Congress's repeated decisions to provide federal employment protections to APJs for decades, I am particularly concerned that *Arthrex*'s remedy constitutes an unwise invasion of the legislative domain.

I recognize that the *Arthrex* panel considered several potential fixes and chose the one it viewed both as

constitutional and minimally disruptive.  But removing long-standing employment protections from hundreds of APJs is quite disruptive.  Given no clear evidence that Congress would have intended such a drastic change, I would defer to Congress to fix the problem.  This is a legislative problem best left to a legislative solution.  Congress faces fewer constraints than we do in fixing an unconstitutional statute.  For example, Congress might choose to: grant the Director unilateral review over all Board decisions; make the Chief PTAB Judge a presidential appointee and grant her review of all Board decisions; provide for review of Board decisions by a panel of three Presidential appointees at the USPTO (having created at least two such positions in addition to the Director); or provide for presidential appointment of all APJs.

In sum, I believe the Director currently exercises sufficient oversight and supervision of APJs to render them inferior officers under the Appointments Clause.  But if APJs must be viewed as principal officers, I question curing the ensuing constitutional violation by removing their Title 5 removal protections because I believe it conflicts with Congress's intent.